UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
TERRELL GIBBS,

         Plaintiff,

   - against -

METROPOLITAN TRANSPORTATION
AUTHORITY, MTA-LONG ISLAND
RAILROAD and ROBERT MUSSO,

         Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**

13-CV-1583 (ILG) (RER)

GLASSER, Senior United States District Judge:

  In this action, plaintiff Terrell Gibbs alleges that his former employer, the Long Island Railroad ("LIRR"), Robert Musso, one of plaintiff's supervisors at the LIRR, and the Metropolitan Transportation Authority ("MTA") (together, "defendants") all discriminated against him on account of his race and age when the LIRR fired him from his probationary job as a Car Appearance Maintainer ("CAM").  That termination, claims plaintiff, violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.; 42 U.S.C. §§ 1981 and 1983; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq.; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107.  Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons that follow, that motion is GRANTED.

## BACKGROUND

Except where otherwise noted, the following facts are undisputed.[1] Plaintiff is an African-American male who was born in 1989. Defs.' Ex. A, Dkt. No. 19-1 (hereinafter "Pl. Dep."), at 7:5-8. On November 16, 2011, the LIRR hired plaintiff as a CAM. Id. at 19:22–20:7. A CAM's duties include the proper disposal of garbage from all train cars and all aspects of cleaning car interiors, such as sweeping and mopping. Id. at 20:16-17. CAMs work in the LIRR's Maintenance and Equipment ("M/E") Department, and the LIRR has a written code of conduct for how M/E employees must behave. Id. at 33:10–34:8; Defs.' Ex. F, Dkt. No. 19-6. Failure to follow that code of conduct may result in an M/E employee's termination. Defs.' Ex. C, Dkt. No. 19-3 (hereinafter "PAL Hr'g Tr."), at 32:5-14; Defs.' Ex. F, Dkt. No. 19-6 (hereinafter "Micheletti Dep."), at 35:6-12.

Pursuant to a collective bargaining agreement between the LIRR and the United Transportation Union, newly-hired CAMs are subject to a one-year probationary period during which they are considered at-will employees-in-training. See generally Defs.' Ex. E, Dkt. No. 19-5. Plaintiff's first assignment as a probationary CAM began on or about November 23, 2011, when he was assigned to a night shift on a work gang at the LIRR's West Side Yard for commuter trains. Pl. Dep. at 42:10-20; Micheletti Dep. at 20:19–21:12. At the time, defendant Musso, a white, 52-year-old gang foreman at that yard, was in charge of supervising between 20 and 30 CAMs there, including plaintiff and other probationary CAMs. Defs.' Ex. B, Dkt. No. 19-2 (hereinafter "Musso Dep.") at 5:7-

---

[1] Plaintiff's denials of knowledge or information sufficient to form a belief as to the truth or falsity of a number of defendants' assertions in their Local Civil Rule 56.1 Statement are "not sufficient to create an issue of fact for Rule 56 purposes" because Local Civil Rule 56.1(c) states that each paragraph in a party's statement made pursuant to that rule "will be deemed to be admitted unless specifically controverted . . ." (emphasis added). See Alfano v. NGHT, Inc., 623 F. Supp. 2d 355, 363 (E.D.N.Y. 2009).

2

14, 24:2-21.  The CAMs were of several different races, including other African-Americans besides plaintiff.  Pl. Dep. at 43:21–45:13.

On January 23, 2012, Musso assigned plaintiff to mop the floors of a train's cars.  Defs.' Ex. K, Dkt. No. 19-11, at 66.  When Musso went to inspect the train, he found plaintiff wearing headphones (it is disputed as to whether they were around his neck or on his ears).  Id.; Pl. Dep. at 35:23-24.  Rule 121 of the M/E Code of Conduct prohibits the use of any "electronic music playing equipment" or headphones while "performing services."  Defs.' Ex. F at 3.  At a hearing conducted pursuant to New York Public Authorities Law § 1276(4) (the "PAL Hearing") regarding the allegations underlying this action, plaintiff testified that his headphones were playing music at the time Musso saw them, but plaintiff later claimed at his deposition in this action that his headphones were not emitting any sound.  Compare PAL Hr'g Tr. at 33:5-20 with Pl. Dep. at 35:19–36:5.  Musso told plaintiff that he could not wear the headphones, and plaintiff admitted that his use of the headphones violated the M/E Code of Conduct.  Pl. Dep. at 36:11-16; PAL Hr'g Tr. at 34:9-18.

Four days later, on January 27, 2012, Musso assigned plaintiff to clean and empty the garbage receptacles on the odd-numbered cars of a train.  Defs.' Ex. K at 66.  When Musso inspected plaintiff's work, he found garbage on at least one seat of a train car plaintiff was supposed to clean.  Id.; Pl. Dep. at 75:6-11.  At the end of plaintiff's shift on that day, Musso issued a verbal warning to plaintiff about his conduct in the presence of another gang foreman, Joshua Rodriquez, and a representative from plaintiff's union.  Defs.' Ex. K at 66; Pl. Dep. at 75:6–76:8.  Although plaintiff spoke to the union representative alone following the warning, he did not tell the representative that he believed Musso was behaving in a discriminatory fashion.  Pl. Dep. at 76:13-24.  At some

3

point between November of 2011 and February of 2012, plaintiff was again reprimanded by Musso for failing to clean a stain off the back of a seat in a train car. PAL Hr'g Tr. at 43:11–44:22. Plaintiff knew that it was his responsibility to clean the stain in question, but he did not clean it until after Musso told him he had missed it. Id. at 45:8-25.

During the probationary period, CAMs' supervisors submit Probationary Evaluation Forms ("evaluations") for each CAM on a quarterly basis to management personnel. The evaluation ranks probationary employees on a scale of "1" to "4," with "1" indicating an unacceptable level of performance and "4" a performance that exceeded expectations. See Defs.' Ex. E at 3-4. Management then reviews the evaluations and all other relevant material (such as employee time sheets) to determine, with the concurrence of the human resources department, whether or not the CAMs' employment should continue. Id. at 4; Micheletti Dep. at 15:20–16:12. At all times relevant to this litigation, the person responsible for reviewing probationary employees' evaluations in the M/E Department was Antonia Micheletti, the Manager of Equipment, Payroll, Auditing and Control. Micheletti Dep. at 15:20–16:21. Musso completed his quarterly evaluation of plaintiff's work performance on February 25, 2012 and forwarded it to Micheletti for review with supporting documentation attached. Defs' Ex. K. Musso rated plaintiff a "1" on his ability to exhibit the required level of job knowledge and/or skills to perform his job, and a "2" (below minimum expectations) in eight other categories. Id. The supporting documentation Musso attached to the evaluation referenced both plaintiff's use of headphones on January 23, 2012 and his failure to clean a train car on January 27, 2012 as grounds for the ratings plaintiff received. Id. at 66.

On March 2, 2012, Micheletti indicated on the evaluation that plaintiff was not meeting departmental expectations because of his improper work performance and violation of the M/E Code of Conduct. Id. at 65. By that time, plaintiff had been transferred to a day shift, and on March 5, 2012, Micheletti sent an email to plaintiff's new gang foremen, Linwood Booker and Benjamin Torregosa, asking whether plaintiff's performance had improved. Pl.'s Ex. 3, Dkt. No. 28-3. Booker told Micheletti that plaintiff "ha[d] been quite consistent in performing his duties as a CAM" since being moved to the day shift. Id. On March 6, 2012, Micheletti wrote on a printed copy of Booker's email that, based on Booker's statement, plaintiff would be "evaluated again, regardless of [the] timing of [the] evaluation process, when he moves to another location." Id.

In a memorandum dated April 16, 2012 that was placed in plaintiff's personnel file, Micheletti indicated that she had spoken to both Musso and Rodiquez, and that "there appear[ed] to be no change with [plaintiff's] performance" after Musso's evaluation. Defs.' Ex. L, Dkt. No. 19-12. Citing this continued poor performance and plaintiff's violation of M/E Code of Conduct Rule 121, Micheletti recommended to the LIRR's human resources department that plaintiff be terminated.[2] Id. At the time Micheletti made that recommendation, she had not met plaintiff and was unaware of his race. Micheletti Dep. at 76:8-11. The human resources department accepted Micheletti's recommendation, and plaintiff was fired on April 19, 2012. Defs.' Ex. N, Dkt. No. 19-14. Plaintiff was the only probationary CAM on Musso's work gang between

---

[2] Micheletti noted at her deposition in this action that plaintiff's late arrival to work on two separate occasions contributed to her decision to terminate him, but this reason is not referenced specifically in the April 16, 2012 memorandum. Compare Micheletti Dep. at 58:24–59:8 with Defs.' Ex. L.

5

November 2011 and January 2012 who was fired after one quarterly evaluation. Musso Dep. at 24:25–25:9.

Plaintiff maintains that Musso's animus towards his race and age was the true cause of his termination. He claims that Musso singled him out for ridicule when in the presence of other co-workers, and that Musso would repeatedly summon him on the yard's radio for no proper reason. Pl. Dep. at 83:4-9. According to plaintiff, Musso made statements to him such as "I don't know why you're here, but I am going to go over my boss to get you out of here" and "You're not a man[;] start acting like a man." Id. at 48:17-23. Plaintiff never personally witnessed Musso treat African-American employees differently than employees of other races, but heard from other co-workers that Musso did so. Id. at 56:19–57:21; 65:5-11. Plaintiff also claims that Musso ignored or played down other violations of the M/E Code of Conduct when other CAMs committed them, but treated plaintiff's violation far more seriously. Id. at 40:23–42:6. Musso denied these allegations at his deposition. See generally Musso Dep.

Plaintiff commenced this action on March 26, 2013. Dkt. No. 1. Defendants answered on June 10, 2013. Dkt. No. 10. Discovery closed on May 30, 2014, and defendants filed their summary judgment motion on July 11, 2014. Minute Entry of Apr. 24, 2014; Dkt No. 17. Plaintiff submitted opposition papers on October 6, 2014, and defendants replied on October 27, 2014. Dkt. Nos. 27-32.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party. . . . A fact is material

if it might affect the outcome of the suit under the governing law." Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010) (quotation marks and citation omitted).

The party moving for summary judgment bears the burden of establishing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In deciding the motion, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted). However, to defeat the motion, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)), and cannot "rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (quotation marks and citation omitted).

## DISCUSSION

### I. Title VII

Title VII prohibits an employer from taking adverse employment action against an employee because of his "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Courts analyze Title VII claims using the three-part framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Under that framework, the employee bears the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. The burden then shifts to the employer to proffer a legitimate non-discriminatory reason for its actions. If it can do so, the burden shifts back to the employee, who must establish that,

notwithstanding the employer's explanation, an illegal discriminatory reason played a motivating role in the adverse employment action. E.g., Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014) (per curiam); Bickerstaff v. Vassar Coll., 196 F.3d 435, 446-47 (2d Cir. 1999).[3]

Plaintiff does not dispute that defendants have articulated a legitimate non-discriminatory reason for firing him: his poor work performance. See Pl. Opp. Mem. at 15. Therefore, the only remaining issues are whether he has stated a prima facie discrimination case and whether discrimination played a motivating role in the LIRR's decision to terminate him notwithstanding its asserted rationale.

**A. Prima Facie Discrimination**

"The burden of establishing a prima facie case of alleged disparate treatment 'is not onerous.'" Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). Plaintiff can satisfy it by showing that (1) he belongs to a protected class, (2) he was qualified for the position that he held, (3) he suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. Id. (citing Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004)). Defendants contend that plaintiff was neither qualified for the position that he held nor subject to termination under circumstances that would permit an inference of discrimination.

---

[3] The third part of the McDonnell Douglas framework is often described as requiring the employee to demonstrate that the employer's proffered reason for the adverse employment action was "pretextual," but that term seems to imply (and defendants indeed argue) that plaintiff must demonstrate that the explanation for why he was terminated is false. He need not do so: "though a discrimination plaintiff may not succeed by proving only that a proffered explanation is false but must prove that discrimination motivated the adverse action, the plaintiff is entitled to succeed by proving discriminatory motivation without proving that a proffered explanation is false." Bickerstaff, 196 F.3d at 447 (quoting Renz v. Grey Adver., 135 F.3d 217, 222 n.3 (2d Cir. 1997)).

8

### 1. Job Qualification

An employee who alleges that his termination was due to discrimination "need not do much to establish his qualification for the position he holds. . . ." Donnelly v. Greenburgh Cent. Sch. Dist. No. 7, 691 F.3d 134, 147 (2d Cir. 2012). It is enough to show "that he possesses the basic skills necessary for performance of the job." Id. (quoting Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 92 (2d Cir. 2001)). Where, as here, "the employer has already hired the employee into the job in question, the inference of minimal qualification is . . . easier to draw . . . because, by hiring the employee, the employer itself has already expressed a belief that [he] is minimally qualified." Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001). Although the LIRR points to Musso's evaluation of plaintiff as evidence that he was not qualified for the position he held, Booker's email to Micheletti describing plaintiff's competence on the day shift indicates that plaintiff possessed the basic skills of a CAM. See Pl.'s Ex. 3. Thus, plaintiff has established this element of his prima facie case, and defendants are not entitled to summary judgment on the grounds that plaintiff was not qualified for the position he held.

### 2. Circumstances Giving Rise to an Inference of Discriminatory Intent

An inference of discriminatory intent may be drawn if an employee shows direct evidence of such intent or that he was subjected to disparate treatment compared to persons who were not members of his protected class but similarly situated in all other material respects to himself. See Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996). Because direct evidence of discriminatory intent will "only rarely be available, . . . 'affidavits and depositions must be carefully scrutinized for circumstantial

9

proof which, if believed, would show discrimination.'" Holcolmb, 521 F.3d at 137 (quoting Gallo v. Prudential Residential Servs., LP, 22 F.3d 1219, 1224 (2d Cir. 1994)).

Plaintiff has shown no direct evidence of discriminatory intent. He concedes that he never heard Musso or any other LIRR employee use racial epithets, say anything demeaning about African-Americans, or even speak differently about members of other races. See Pl. Dep. at 47:15–48:7, 57:3-21; PAL Hr'g Tr. at 38:5-20. Micheletti did not know plaintiff's race at the time she recommended he be terminated. Micheletti Dep. at 76:8-11. Although plaintiff purportedly heard other employees say that Musso treated African-Americans differently than Caucasians, such secondhand statements are inadmissible hearsay to the extent that plaintiff attempts to use them for the truth of their assertions. And even though plaintiff felt that Musso's statements such as "start acting like a man" might have been made with animus towards his race, the statements are not racially motivated on their faces, and plaintiff presents no evidence beyond his own feelings that they contained a racial subtext. In short, plaintiff has shown nothing more than his own subjective belief that he was discriminated against, which is not enough to make out a prima facie discrimination case under Title VII. See, e.g., Brodt v. City of New York, 4 F. Supp. 3d 562, 568 (S.D.N.Y. 2014) (citing, inter alia, Bickerstaff, 196 F.3d at 456); Simmons v. AT&T Corp., No. 96 Civ. 2844, 1998 WL 751659, at *9 (S.D.N.Y. Oct. 28, 1998), aff'd, 182 F.3d 901 (table), 1999 WL 464983 (2d Cir. June 21, 1999).

Similarly, plaintiff has not shown any circumstantial proof of disparate treatment. Plaintiff argues that he was punished more severely for his transgressions than other employees, but he submits no admissible evidence in support of this claim. Although he claims that there were "less than three" other instances when Musso

observed employees wearing headphones without disciplining them, he does not recall the races of those employees, and indeed provides no information about those incidents beyond his own limited ipse dixit. See Pl. Dep. at 41:2-14.[4] None of the other African-American probationary CAMs working alongside plaintiff were fired when he was, even though, according to plaintiff, their supervisors witnessed them violating the M/E Code of Conduct. See id. at 38:15–40:10. Thus, "the most [the evidence] establishes, even in the light most favorable to the plaintiff, is that [he] was treated differently from all other employees, both white and black." See Thornton v. Simpson Thatcher & Bartlett, No. 83 Civ. 8409, 1986 WL 6012, at *4 (S.D.N.Y. May 21, 1986), aff'd mem., 833 F.2d 1003 (2d Cir. 1986). Accordingly, he has not made out a prima facie case under Title VII, and summary judgment is granted to defendants on this issue.

### B. Discrimination as a Motivating Role

Even assuming arguendo that plaintiff has stated a prima facie discrimination claim, he cannot defeat defendants' motion for summary judgment because he has not shown that a reasonable finder of fact could conclude that racial discrimination played a motivating role in his dismissal notwithstanding the LIRR's asserted legitimate reason for firing him. Plaintiff points to Musso's alleged statements that he would "go over my boss to get you out of here" and Micheletti's unexplained reversal of her earlier decision to re-evaluate plaintiff before recommending he be terminated as evidence that his firing was pretextual. But as previously noted, Musso's statements do not implicate

---

[4] Plaintiff's attempt to use his deposition to backtrack from his admission at the PAL Hearing that he violated M/E Code of Conduct Rule 121 by using headphones while working does not create a genuine issue of material fact. In "the absence of any corroborating evidence in the record and . . . [the] inconsistencies and contradictions within the plaintiff's deposition testimony," the Court cannot credit plaintiff's belated repudiation of his earlier sworn statement. See Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (citing, inter alia, Shabazz v. Pico, 994 F. Supp. 460, 468-71 (S.D.N.Y. 1998) (Sotomayor, D.J.))

11

plaintiff's race, and Micheletti was unaware of it when she made the recommendation that the LIRR fire plaintiff. The statements made by unknown LIRR employees about Musso's animus towards African-Americans, which plaintiff recounted at his deposition and now relies on heavily in attempting to avoid summary judgment, are inadmissible hearsay. He therefore fails to provide any evidence that defendants' stated rationale, though potentially pretextual, was a pretext for firing him because of his race, and his case cannot proceed. See, e.g., Fisher v. Vassar Coll., 114 F.3d 1332, 1339 (2d Cir. 1997) (en banc); Cook v. Pan Am. World Airways, Inc., 647 F. Supp. 816, 824 (S.D.N.Y. 1986) ("It is not enough . . . to show that the employer made an unwise business decision, or . . . acted arbitrarily or with ill will" (quoting Gray v. New Eng. Tel. & Tel. Co., 792 F.2d 251, 255 (1st Cir. 1986)).

## II.  42 U.S.C. §§ 1981 and 1983

42 U.S.C. § 1981 protects the rights of "[a]ll persons within the United States . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1983 prohibits those acting under color of state law from depriving others of their federal rights. See Ahlers v. Rabinowitz, 684 F.3d 53, 60-61 (2d Cir. 2012) (citation omitted). Plaintiff alleges that the decision to terminate him violated both Section 1981 and the rights that the Equal Protection Clause of the Fourteenth Amendment affords him via Section 1983.

### A. Section 1981

Section 1981 applies only to instances of racial discrimination, and plaintiff's age discrimination claim under the statute fails accordingly. See Lofland v. Meyers, 442 F. Supp. 955, 956 (S.D.N.Y. 1977). As for his race-based claims, "[t]he substantive

12

standards applicable to claims of employment discrimination under Title VII . . . are also generally applicable to claims of employment discrimination brought under Section 1981. . . ." Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010). In other words, an employee's claims arising out of the same employer conduct "must stand and fall together" regardless of whether they are brought pursuant to Title VII or Section 1981. See Wojcik v. Brandiss, 973 F. Supp. 2d 195, 216 (E.D.N.Y. 2013) (quoting, inter alia, Feingold, 366 F.3d at 159). Since plaintiff cannot prevail on his Title VII claims, summary judgment is granted to defendants on his Section 1981 claims as well.

### B. Section 1983

Plaintiff's equal protection claim does not allege that he is a member of a specific class that suffered unequal treatment at defendants' hands, but rather that defendants' actions "singled [him] out as separate, apart, and unequal to others similarly situated." Compl. ¶ 73. In other words, plaintiff deems himself a "class of one." See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam) (recognizing the general availability of the class-of-one cause of action). However, the Supreme Court has expressly forbidden employees from lodging class-of-one claims against public employers, because "treating like individuals differently is an accepted consequence of the discretion granted" to an employer, even if that employer is the state. See Engquist v. Or. Dep't of Agric., 553 U.S. 591, 603 (2008). Since the LIRR is a public employer, see Jagmohan v. LIRR, No. 12-CV-3146, 2014 WL 4417745, at *7 (E.D.N.Y. Sept. 8, 2014), plaintiff's Section 1983 claim cannot proceed, and is therefore dismissed.

### III. The ADEA

Defendants note, and plaintiffs do not dispute, that the ADEA's protections against age discrimination only extend to employees who are at least 40 years old. See

13

Defs.' Mem. at 22 (citing 29 U.S.C. § 631(a)).  Plaintiff was 23 years old when he was terminated, and his ADEA claims fail accordingly.

### IV. Involvement of the MTA

Under New York law, the LIRR is a subsidiary of the MTA, and its employees are not employees of the MTA itself.  See N.Y. Pub. Auth. Law § 1266(5).  Since the MTA cannot be said to be plaintiff's employer or to have taken any adverse employment action against him, summary judgment is granted to the MTA on all causes of action listed in the Complaint.

### V. State and Local Law

A district court may "decline to exercise supplemental jurisdiction" over state and local law claims if it has "dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Where, as here, all federal claims have been dismissed before trial, the usual course of action is for the Court to decline to exercise supplemental jurisdiction.  See Pitchell v. Callan, 13 F.3d 545, 549 (2d Cir. 1994).  In this case, however, the interests of judicial economy and comity favor immediate resolution of one of plaintiff's state law claims.  "[I]t is well-established that the substantive standards for liability under the NYSHRL and Title VII are coextensive," and plaintiff's state law claim for racial discrimination under the NYSHRL is therefore dismissed with prejudice for the same reasons as his Title VII claim.  See Vuona v. Merrill Lynch & Co., 919 F. Supp. 2d 359, 393 (S.D.N.Y. 2013).  His remaining claims of age discrimination under the NYSHRL and age and racial discrimination under the NYCHRL, however, are evaluated under different standards than his federal claims, and state courts are best equipped to resolve them.  See, e.g., id. at 393-94; Thomas v. City of New York, 953 F. Supp. 2d 444, 462 (E.D.N.Y. 2013).  The Court therefore dismisses those claims without prejudice.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. The Complaint is dismissed with prejudice in its entirety as against the MTA, and with prejudice as against Musso and the LIRR except as to plaintiff's claims of age discrimination under the NYSHRL and age and racial discrimination under the NYCHRL, which are dismissed without prejudice. The Clerk of Court is directed to enter judgment in favor of defendants, and to close this case.

SO ORDERED.

Dated:  Brooklyn, New York
        November 12, 2014

                                          /s/
                                    I. Leo Glasser
                                    Senior United States District Judge